J F:\files\Legal\JG\41174-Memorandum of Law.wpd
**GOLDBERG & ASSOCIATES**
75 Main Street, Suite 201
Millburn, New Jersey 07041
(201) 420-1778
*Attorneys for Defendant*
*American Express Bank F.S.B.,*
*i/s/h/a American Express Centurion Bank*

-------------------------------------------------X

| | |
|---|---|
| NICHOLAS COSMAS, | UNITED STATES DISTRICT COURT |
| | DISTRICT OF NEW JERSEY |
| Plaintiff, : | |
| : | DOCKET NO. 07-CV-6099(FLW) |
| v. | Civil Action |

AMERICAN EXPRESS CENTURION BANK,

Defendant.

-------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF AMERICAN EXPRESS CENTURION BANK'S MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF'S COMPLAINT

## PRELIMINARY STATEMENT

Defendant, American Express Bank F.S.B., *i/s/h/a* American Express Centurion Bank ("American Express"), respectfully submits this Memorandum of Law in support of its motion for summary judgment dismissing each and every cause of action set forth in plaintiff's Complaint.

## STATEMENT OF FACTS

This suit arises from a prior underlying action between American Express and plaintiff for unpaid charges incurred on an American Express Small Business Gold Card issued to Tri-State Environmental Contracting, Inc. ("Tri-State"). Tri-State was in the business of asbestos abatement, and from its inception in 1993 until it went out of business in 2004, plaintiff was its controller. As controller, plaintiff applied on behalf of Tri-State for a Business Gold Card with American Express. This application was approved and business cards were issued to plaintiff and other primary employees of Tri-State under account number 3783-xxxx-xxxx (plaintiff's "Business Account").

Due to Tri-State's financial difficulties, in 2003 it stopped paying for charges made on plaintiff's Business Account and as a result, in October 2003, American Express cancelled that account. At that point, approximately $49,000 in unpaid principal charges had been accrued on plaintiff's Business Account.

Plaintiff also had a separate personal account with American Express, under Account number 3718-xxxx-xxxx (plaintiff's "Personal Account"). The statements for plaintiff's Business Account and plaintiff's Personal Account, were - at least at the start - both mailed to plaintiff's home address.

At about the same time that Tri-State stopped paying for charges that had been made on

plaintiff's Business Account, plaintiff also stopped making payments on plaintiff's Personal Account. Since plaintiff had an unpaid balance in excess of $13,000 on plaintiff's Personal Account, American Express cancelled that account in October 2003 as well. That account was also then reported as being delinquent.

In an effort to have the charges on plaintiff's Business Account paid, in 2005 American Express hired a collection firm, NIC, which then retained its own counsel. NIC brought suit against plaintiff in Mercer County Superior Court (the "Underlying Suit"). The case proceeded to trial and, on August 10, 2006, Judge Paul Innes issued an Order dismissing American Express' Complaint. The Court ruled that Mr. Cosmas was not personally responsible for the charges that he, inter alia, made on plaintiff's Business Account because American Express did not prove that plaintiff received the cardmember agreement which permitted American Express to seek payment for charges from either the company or individual card-holders.

Plaintiff claims that despite the ruling, American Express continued to report the debt from plaintiff's Business Account as being past due and further claims that as a result of that continued reporting, he has had to pay higher interest fees on numerous other credit cards, some applied for after plaintiff admittedly knew that American Express had incorrectly reported plaintiff's Business Account as delinquent. This suit against American Express then followed.

However, in addition to the fact that plaintiff was delinquent on his Personal Account and that that delinquency was reported, it is a matter of public record that plaintiff was also subject to a judgment in the amount of $101,993.13, entered on consent in a civil action in the Southern District of New York in Trustees of the Mason Tenders District Council Welfare Fund, Pension Fund, Annuity Fund and Training Program Fund v. Tri-State Environmental Contracting, Inc. and Nicholas Cosmas, 05cv8239 (NRB). That action sought recovery of unlawfully withheld

ˇ3ˇ

fringe-benefits contributions, unremitted dues checkoffs, and PAC contributions. Public records further reveal that the Southern District judgment, which was entered against plaintiff on consent on July 11, 2006, was subsequently docketed and registered as a foreign judgment by this Court.

Nonetheless, despite plaintiff's delinquency on his Personal Account and despite the entry of the consent judgment, plaintiff contends that damage to this credit rating, resulting in higher interest rates on various other credit cards he carried, was solely the result of American Express' alleged reporting regarding the delinquent balance on plaintiff's Business Account.

# ARGUMENT

## POINT I

### PLAINTIFF'S FIRST CAUSE OF ACTION SEEKING SPECIFIC PERFORMANCE SHOULD BE DISMISSED BECAUSE IT IS MOOT

Plaintiff's first cause of action, which seeks specific performance directing that

American Express cease reporting plaintiff's account as being past due, should be

dismissed because the relief sought is moot.

As averred in the deposition testimony of American Express' witness, Edmond

Garabedien, American Express stopped reporting plaintiff's account as delinquent in

January, 2008:

> **Q.** Now this matter continued on from Mr. Cosmas' testimony
> and from different copies of correspondence that's been marked, for
> a year and a half after the litigation was resolved. Is that what your
> records indicate?
> **A.** When you say this matter, you mean the credit reporting?
>
> **Q.** Right.
> **A.** Based on what I have been able to ascertain the answer is,
> yes. The credit report was not deleted until the end of 2007 or
> January of 2008, something to that effect.
>
> **Q.** Yeah. It was actually I think at some point it was probably
> more like March of 2008?
> **A.** I think it was January of 2008.

(Pages 17-18 of deposition transcript of Edmond Garabedien, annexed to the

Affirmation of Jack Gross as **Exhibit "H"**).

This was also confirmed by plaintiff at his deposition:

> **Q.** Now could you set out for me all of the claims that you
> have against American Express in this lawsuit? What are your
> claims against them?
> **A.** All of the claims, yes. My other credit card because of the
> damage to my credit, I was charged additional interest rates higher

on any card that I had. I had on my personal account over 600,000 reward points that were not never reinstated. Complete harassment from 2004 to 2008 continued till Mr. Provost appeared before the judge in order to case these harassing calls (emphasis supplied).

(Page 37 of deposition transcript of plaintiff, annexed to the Affirmation of Jack

Gross as **Exhibit "G"**).

And again:

Q.   But it's no longer being reported?
A.   What do you mean?

Q.   When you say this is a year ago, we're in 09. It's no longer being reported in '09; right?
A.   What do you mean by reported?

Q.   By American Express?
A.   By American Express?

Q.   Yes.
A.   I have to ask,

Q.   Well, you told me your attorney went to court and had it resolved?
A.   Resolved, right.

Q.   So it's no longer being reported in '09; right?
A.   Right, right.

(Page 233 of deposition transcript of plaintiff, annexed to the Affirmation of

Jack Gross as **Exhibit "G"**).

Consequently, plaintiff's first cause of action for specific performance directing

that American Express cease reporting plaintiff's account as past due is moot.

˅6˅

## POINT II

## PLAINTIFF'S SECOND CAUSE OF ACTION FOR NEGLIGENCE MUST BE DISMISSED FOR LACK OF PROXIMATE CAUSE

New Jersey law requires that the proponent of a negligence claim must establish four core elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages. Polzo v. County of Essex, 196 N.J. 569, 584, 960 A.2d 375 (2008); Weinberg v. Dinger, 106 N.J. 469, 524 A.2d 366 (1987).

The gravaman of plaintiff's damages claim is that interest on a number of his credit cards increased after American Express began reporting his account as delinquent. However, there is no evidence that it was American Express' conduct with respect to plaintiff's Business Account that proximately caused plaintiff's negative reporting.

First, plaintiff was delinquent on his Personal Account and that was automatically reported to the credit reporting agencies.

In addition, plaintiff was also subject to a judgment in the amount of $101,993.13, entered on consent in a civil action in the Southern District of New York in Trustees of the Mason Tenders District Council Welfare Fund, Pension Fund, Annuity Fund and Training Program Fund v. Tri-State Environmental Contracting, Inc. and Nicholas Cosmas, 05cv8239 (NRB). Public records further reveal that the Southern District judgment was entered against plaintiff on consent on July 11, 2006, and was subsequently docketed and registered as a foreign judgment by this Court.

Moreover, the finance charges on plaintiff's statements fluctuated from month to month, sometimes going up and other times going down, undermining plaintiff's claim that his finance charges only went up and did so only after American Express incorrectly

reported plaintiff.

For example, plaintiff's statements from MBNA, which plaintiff's expert's report identifies as Bank of America, account number 9129, annexed to the Affirmation of Jack Gross as **Exhibit "J"**, reflect that the APR for the period covered by plaintiff's January 2004 statement was 5.34%; for February 2004 it was 5.36%; for March 2004 it was 5.40%; for April 2004 it jumped to 11.99%; but in May through June 2004, it dropped back to 4.32% and stayed at approximately that rate throughout 2004 and jumped to 13.24% in January 2005.

Clearly then, plaintiff's claim that his finance rate increased because of American Express' reporting is unsupported by these records because it shows that plaintiff's Bank of America APR increased for only one month (in April 2004), but then basically stayed level throughout 2004. In order for plaintiff to establish proximate cause he would have had to show that his APR increased as a direct result of American Express' alleged conduct. Here, no such showing has been made. Rather, plaintiff's APR fluctuates for reasons clearly unrelated to American Express' reporting.

Notably, plaintiff admitted at his deposition that in March 2004, American Express started reporting him delinquent on his Business Account:

**Q.**   And this covers what period, sir? From '03 or '04 through what?

**A.**   From March '04.

　　　*　　　　　　　*　　　　　　　*

**Q.**   Okay. Now why do you start with March of '04 as the date?

**A.**   That's when American Express noted it on my credit report that I was delinquent.

**Q.**   How do you know that?

**A.** How do I know that?

**Q.** Yes.
**A.** I had credit reports.

**Q.** From what date, March?
**A.** Yeah.

**Q.** Did you have them from February?
**A.** Did I have them? I guess, I guess I did in order to start with March.

**Q.** Well, I'm asking. I don't want you to guess. Did you have them from February?
**A.** I am assuming I did. I can't answer.

**Q.** So you don't know one way or the other?
**A.** I know they were there on March of '04.

**Q.** What I'm asking is did you have them there for February?
**A.** No.

**Q.** Did you look at your credit reports for February of '04?
**A.** I would say I did at the time.

**Q.** Do you remember looking at them?
**A.** Well, I'm -- according to my way of thinking, the way I work, I saw it in March.

**Q.** I understand you saw it in March. What I'm asking you is --
**A.** I cannot tell you.

                    *              *              *

**Q.** So is it possible that it had been reported before March of '04 of you didn't recall one way or the other?
**A.** No, I think the problem with American Express started around this period.

**Q.** In March of '04?
**A.** No beforehand, but . . .

**Q.** So that's what I'm asking.
**A.** I cannot give you a direct answer. All I know, it was on the March of '04.

**Q.** Right. And I'm trying to understand how you know for sure it was March of '04 and not January of '04 for example? How do you know that?

**A.** I can answer, I can only tell you that it was on for March of '04.

(Pages 41-44 of deposition transcript of Nicholas Comas, annexed to the Affirmation of Jack Gross as **Exhibit "G"**).

Yet, despite plaintiff's claim, in May and June of 2004, plaintiff's APR dropped from 11.99% to 4.32%. If American Express' reporting of plaintiff caused plaintiff's credit problems, one would reasonably expect plaintiff's APR to increase once American Express reported plaintiff. Instead, just the opposite occurred.

Similarly, the APR for the period covered by plaintiff's July 2004 MBNA statement was 4.33%; for August 2004 it was 4.34%; for September 2004 it was 4.35%; for October 2004 it was 4.3%; for November 2004 it was 4.40%; for December 2004 it was 4.42% and for January 2005 it jumped to 13.24% and continued to go up through 2005 and 2006 to as high as 35%. Thus, it is readily apparent that there is no causality between American Express' alleged conduct and plaintiff's claimed damages.

Similarly, correspondence from what plaintiff's expert's report identifies as Chase, account number 0191, annexed to the Affirmation of Jack Gross as **Exhibit "K"**, reflect that plaintiff's rate change was put into effect in approximately February 2005. Here again, there is no causual relationship between American Express' conduct and the increase in plaintiff's fiancé rate which were only put into effect almost a year after plaintiff claims that American Express first began reporting his account as delinquent in March 2004.

Again, records from what plaintiff's expert's report identifies as Fleet, account

number 6182, annexed to the Affirmation of Jack Gross as **Exhibit "L"**, show that plaintiff's APR often fluctuated from month to month and obviously had no bearing to American Express' conduct. For example, plaintiff's APR for the period covered by his January 2006 statement was 13.24%; for February 2006 it was 18.24%; for March 2006 it was 23.59%; for April 2006 it dropped to 18.74%; and for May 2006 it went up to 19.24%. Here again it is apparent plaintiff's APR fluctuates throughout the course of his usage of his Fleet account and it is clearly not linked to American Express' conduct.

The same is apparent from a review of what plaintiff's expert's report identifies as Harris Bank (MBNA), account number 3838, annexed to the Affirmation of Jack Gross as **Exhibit "M"**. Those records, which were only produced from July 2004 forward, show that for the period covered by plaintiff's July through September statements, his APR was 13.9%; for November 2004 it went to 16.49%; for December 2004 it jumped to 23..67% but then in January 2005 it dropped to 12.99% and stayed at that rate until July 2005 when it increased to 16.5%. It then dropped in August 2005 to 12.99% and stayed at that rate until November 2005 when it increased to 23.99% and stayed at that rate through May 2006 when it jumped to 28.66% for June 2006.

Finally, plaintiff's own expert's report, annexed to the Affirmation of Jack Gross as **Exhibit "F"**, is completely silent on the issue of causation, further undermining plaintiff's assertion that it was American Express' alleged conduct that caused these random fluctuations in plaintiff's finance charges.

Accordingly, plaintiff's negligence claim fails for lack of the ability to establish proximate cause and should therefore be dismissed.

## POINT III

## PLAINTIFF'S THIRD CAUSE OF ACTION SOUNDING IN INTENTIONAL TORT SHOULD BE DISMISSED BECAUSE NEW JERSEY PERMITS A PRIMA FACIE TORT CLAIM ONLY IF NO OTHER CAUSE OF ACTION IS AVAILABLE

In Taylor v. Metzger, 152 N.J. 490, 522, 706 A.2d 685 (1998), New Jersey's Supreme Court held that "[p]rima facie tort claims have been most frequently permitted only in the limited situations in which plaintiffs would have no other causes of action." Id. at 523, 706 A.2d 685 and explicitly decline to recognize a claim in prima facie tort. Ibid.

See also Silvestre v. Bell Atl. Corp., 973 F.Supp. 475, 485 (D.N.J. 1997), (noting that under New Jersey law, the claim of "prima facie tort is designed to redress unjustified 'intentional, willful or malicious harms' where no adequate common law or statutory remedy exists"), (quoting Mehlman v. Mobil Oil Corp., 291 N.J. Super. 98, 137, 676 A.2d 1143 (App. Div. 1996), aff'd on other grounds, 153, N.J. 163, 707 A.2d 1000 (1998)).

Thus, a prima facie tort cause of action should not become a catch-all alternative for every cause of action which cannot stand on its own legs and "[w]here relief may be afforded under traditional tort concepts, prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort." Bandag of Springfield Inc. v. Bandag, Inc., 662 S.W.2d 546, 554 (Mo. Ct. App. 1983) ("If there is any other traditional tort remedy available, then a prima facie tort cause of action should not lie." (quoting Forkosch, An Analysis of the "Prima Facie Tort" Cause of Action, 42 Cornell L. Rev. 465, 481 (1957))).

Similarly, in <u>Richard A. Pulaski Construction Co. v. Air Frame Hangars</u>, 195 N.J.

457, 950 A.2d 868 (2008), the New Jersey Supreme Court stated that this amorphous tort

may be available, but that it is strictly a "gap-filler" and is limited exclusively to those

instances of intentional and culpable conduct unjustified under the circumstances and

that, as a threshold matter, do not fall within a traditional tort cause of action. <u>Id</u>. at 460.

Plaintiff here has available both statutory and tort claims. Therefore, his claim for

prima facie tort should be dismissed. <u>Linda Gibbs v. Caswell Massey, et al</u>., Civ. No. 07-

3604 U.S. Dist. (2009).

## PLAINTIFF'S THIRD CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH THAT AMERICAN EXPRESS' CONDUCT WAS MALICIOUS OR RETALIATORY

Plaintiff's third cause of action should also be dismissed because the record has

not established that American Express' conduct was malicious or retaliatory.

Tellingly, at his deposition, plaintiff could not set forth any specific facts to

support his claim that American Express' conduct was malicious or retaliatory:

> **Q.** Let me continue then. Mr. Cosmas, at some point you had put in a certification when in which you said and if you want to take a look at it, let me share it with you. This is dated -- it's not dated, but it says in paragraph 12, the second sentence, the defendant is either reckless or malicious and just doesn't care and refused to correct my credit status. Do you see that?
> **A.** Mm-hmm.
>
> **Q.** And you're talking about American Express in that?
> **A.** Defendant is either reckless or a malicious and just doesn't care to --
>
> **Q.** You're speaking about American Express?
> **A.** Yes.
>
> **Q.** When you're saying they're being malicious, what is your basis for saying they're being malicious?

A.   By not doing what they're supposed to do.

Q.   Anything else?
A.   Isn't --

Q.   I'm not engaging in a debate. I'm just asking if there's anything else? Any other reason why you said that American Express was being malicious in its conduct?
A.   Yes, in not trying to straighten out a situation that is their fault.

Q.   Any other reason why you believe American Express is malicious?
A.   Yes, their collection agencies didn't stop. They kept putting -- they didn't stop them.

Q.   Okay. My other reasons, Mr. Cosmas, why you believe American Express was being malicious?
A.   Yes, by not returning the points either.

Q.   By not returning the points?
A.   Mm-hmm.

Q.   Any other reasons why you claim they were being malicious?
A.   When we were supposed to show up with Berger, they showed no care.

Q.   So getting back to what you had said before?
A.   Yes, it's the same thing.

Q.   Anything else other than what we've spoken about?
A.   That's it. That's all I can think of right now.

(Pages 229-230 of deposition transcript of plaintiff, annexed to the Affirmation of

Jack Gross as **Exhibit "G"**).

In fact, the deposition testimony of American Express' witness, Edmond

Garabedien, establishes that the failure of American Express to cease reporting on

plaintiff's account once the New Jersey Court ruled in plaintiff's favor was due to the

failure of the collection firm or the law firm that it retained to advise of the outcome of

that suit:

**Q.**     Okay; all right. Now what type of - - like you said, you were involved with compliance. What does American Express do as a corporation to avoid situations like this so there are safe guards if somebody calls up and says it's not me, it shouldn't happen and they finally essentially prove their innocence which he did in 2006? What steps does American Express take, what procedure do you have to follow so that these things don't happen?

**A.**     Well, the contacting American Express' front line, you know, telephone service center representatives would be - - it would be difficult for them to create any type of a file because the account is technically no longer with American Express, it's with one of the collection agencies. So the - - and again those attorneys although they worked on, you know, on the case that's titled American Express verses Mr. Cosmas, they work for the collection agency. They are contracted by the collection agency itself. The responsibility of the attorney and the collection agency to notify us of what steps need to be taken to safe guard the outcomes of these lawsuits, I mean they same way they notify us when they obtain a judgment in our favor, they should certainly notify us when there's a judgment entered negative to American Express then the appropriate steps would be taken. I don't know that this actually took place.

(Pages 18-19 of deposition transcript of Edmond Garabedien, annexed to the

Affirmation of Jack Gross as **Exhibit "H"**).

Thus, there is no basis for the claim that American Express' conduct was due to

malicious and/or retaliatory conduct, and therefore for this reason as well, plaintiff's third

cause of action should be dismissed.

## PLAINTIFF'S FOURTH CAUSE OF ACTION SHOULD BE DISMISSED TO THE EXTENT IT FAILS TO DETAIL THE SPECIFIC VIOLATIONS AMERICAN EXPRESS IS ALLEGED TO HAVE COMMITTED

Federal Rule of Civil Procedure 8(a)(2), requires that a pleading give a defendant

fair notice of what the claim is and the grounds upon which it rests.

Plaintiff's fourth cause of action alleges, inter alia, that American Express has "violated . . . other U.S.C.A Code Sections by reporting and continuing to file false and misleading information with the credit reporting agencies against plaintiff"(emphasis supplied).

This portion of plaintiff's fourth cause of action is undeveloped and does not notify American Express of the claim being asserted against it. It is in fact so barebones that it only refers to "other" U.S.C.A. Code Sections without any substantive detail so as to provide defendant with fair notice of what Code/Section is being claimed to have been violated and with no information regarding the grounds on which plaintiff's claim rests.

A plaintiff's Rule 8 obligation to provide the 'grounds' of his relief to entitlement to relief requires more than labels and conclusion, and a formulaic recitation of the elements of a cause of action will not do. Bell Atlantic Corporation v. William Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007). Rule 8 "requires a 'showing' rather than a blanket assertion, of entitlement to relief." Id. at 1965 n.3. "The threshold requirement of Rule 8(a)(2) is that the 'plain statement' possess enough heft to sho[w] that the pleader is entitled to relief." Id., at 1966. A Complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1964 & n.3.

Put another way, Rule 8(a)(2) requires a "showing" rather than a blanket assertion of an entitlement to relief. Without some factual allegation in the Complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice," but also the "grounds" on which the claim rests. See Twombly, Id. at 1965 n.3.

Accordingly, for this reason as well, plaintiff's fourth cause of action should be dismissed.

### PLAINTIFF'S FOURTH CAUSE OF ACTION ALLEGING VIOLATION OF THE FAIR CREDIT REPORTING ACT SHOULD BE DISMISSED BECAUSE IT ONLY APPLIES TO CREDIT REPORTING AGENCIES AND AMERICAN EXPRESS IS NOT A CREDIT REPORTING AGENCY

To the extent that plaintiff's fourth cause of action does not suffer from vagueness and properly asserts a claim under Title 15, the Fair Credit Reporting Act ("FCRA"), it must be dismissed because the FCRA only applies to credit reporting agencies, and American Express is not a credit reporting agency.

The FCRA defines "consumer reporting agency" as

1. Any person which, for monetary fees, dues or on a cooperative nonprofit basis,

2. Regularly engages in whole or part in the practice of assembling or evaluating consumer credit information or other information on consumers,

3. For the purpose of furnishing consumer reports to third parties, and

4. Which uses any means of facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

American Express does not fit the FCRA's definition of a consumer reporting agency because (a) it does not regularly assemble or evaluate consumer credit information (b) does not do so for the purpose of furnishing consumer reports to third parties, and (c) and does not do so for monetary fees or on a cooperative basis.

Accordingly, American Express cannot be held to have violated the FCRA and plaintiff's fourth cause of action should therefore be dismissed.

### PLAINTIFF'S FOURTH CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE THE FAIR CREDIT REPORTING ACT SPECIFICALLY EXCLUDES REPORTS SUCH AS THE ONE AT ISSUE

§1681a(d)(2)(A) of the FCRA contains a number of exclusions for the term consumer report:

˅17˅

(2) Exclusions - Except as provided in paragraph (3), the term "consumer report" does not include -

    (A)    subject to section 1681 s-3, any-

        (i)    report containing information solely as to transactions or experiences between the consumer and the person making the report;

        (ii)    communication of that information among persons related by common ownership or affiliated by corporate control; or

        (iii)    communication of other information among persons related by common ownership or affiliated by corporate control, if it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons and the consumer is given the opportunity, before the time that the information is initially communicated, to direct that such information not be communicated among such persons.

Under this provision, a "consumer report" generally means a communication of any information that bears on a consumer's "credit worthiness for a number of purposes," but expressly excludes any reports "solely as to transactions or experiences between the consumer and the person making the report." 15.U.S.C.A. § 1681a(d)(2)(A)(i). The FCRA, therefore, does not apply to business entities who allegedly wrongfully reported credit delinquencies to credit bureaus based upon their own experiences with the consumer. See Mason v. Chase Manhattan Bank USA, N.A., 194 F.3d 1313, No. 98-4144, 1999 WL 970280, at 2 (6th Cir. Oct 15 1999), (unpublished opinion) (holding information disclosed by a bank to a credit reporting agency is not a "consumer report" under the terms of FCRA); Miller v. Trans Union Corp., 24 Fed. Appx. 422, at 424, 2001 WL 1563928, at 1 (6th Cir. 2001), (holding that neither a bank nor a retail a merchant were consumer reporting agencies within meaning of FCRA because they "did not furnish consumer reports to third parties but, rather,

˅18˅

reported information to credit reporting agency based solely on information contained in their own ledgers"); and Smith v. First Nat's Bank of Atlanta, 837 F.2d 1575, 1578 (11th Cir. 1988), (holding defendant bank was not "credit reporting agency" under the FCRA where it "did no more than furnish information regarding an account in the name of plaintiff to a reporting agency").

Here, the reports at issue originally came from American Express and contained information that related solely to American Express' experiences with plaintiff. Thus, these exchanges are not covered by the FCRA and American Express can not be found to have been in violation of that Act. For this reason as well, plaintiff's fourth cause of action should therefore be dismissed.

## PLAINTIFF'S FOURTH CAUSE OF ACTION
## IS TIME BARRED

Plaintiff admitted at his deposition that he knew in March 2004 that American Express was reporting him as being delinquent for charges on plaintiff's Business Account:

**Q.** And this covers what period, sir? From '03 or '04 through what?
**A.** From March '04.

       *             *           *

**Q.** Okay. Now why do you start with March of '04 as the date?
**A.** That's when American Express noted it on my credit report that I was delinquent.

**Q.** How do you know that?
**A.** How do I know that?

**Q.** Yes.
**A.** I had credit reports.

˅19˅

**Q.** From what date, March?
**A.** Yeah.

**Q.** Did you have them from February?
**A.** Did I have them? I guess, I guess I did in order to start with March.

**Q.** Well, I'm asking. I don't want you to guess. Did you have them from February?
**A.** I am assuming I did. I can't answer.

**Q.** So you don't know one way or the other?
**A.** I know they were there on March of '04.

**Q.** What I'm asking is did you have them there for February?
**A.** No.

**Q.** Did you look at your credit reports for February of '04?
**A.** I would say I did at the time.

**Q.** Do you remember looking at them?
**A.** Well, I'm -- according to my way of thinking, the way I work, I saw it in March.

**Q.** I understand you saw it in March. What I'm asking you is --
**A.** I cannot tell you.

    *      *      *

**Q.** So is it possible that it had been reported before March of '04 of you didn't recall one way or the other?
**A.** No, I think the problem with American Express started around this period.

**Q.** In March of '04?
**A.** No beforehand, but . . .

**Q.** So that's what I'm asking.
**A.** I cannot give you a direct answer. All I know, it was on the March of '04.

**Q.** Right. And I'm trying to understand how you know for sure it was March of '04 and not January of '04 for example? How do you know that?
**A.** I can answer, I can only tell you that it was on for March of

˅20˅

'04.

(Pages 41-44 of deposition transcript of Nicholas Comas, annexed to the Affirmation of Jack Gross as **Exhibit "G"**).

The FCRA has a statute of limitations, limiting suit to two years from the date liability arises 15 U.S.C. §1681p provides:

> An action to enforce any liability created under this subchapter may be brought in any appropriate Unites States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within two years from the date on which the liability arises. . .

Although plaintiff admittedly knew in 2004 of the wrongful reporting plaintiff only commenced suit against American Express by filing a Complaint with the Superior Court of New Jersey on or about November 30, 2007 and serving same on or about December 11, 2007 (see Complaint annexed as **Exhibit "A"** to the Affirmation of Jack Gross), long after the applicable statute of limitations.

Accordingly, for this reason as well, plaintiff's fourth cause of action should be dismissed.

## WHATEVER THE MERITS OF PLAINTIFF'S FOURTH CAUSE OF ACTION, IT DOES NOT ENTITLE PLAINTIFF TO PUNITIVE DAMAGES

Whatever the merits of plaintiff's fourth cause of action, plaintiff is not entitled to punitive damages under the FCRA.

The FCRA authorizes punitive damages against any person who willfully fails to comply with any requirement under this title with respect to any consumer is liable to that consumer in such amount of punitive damages as the Court may allow. 15 U.S.C. § 1681n(a)(2).

The Third Circuit has held that in order to prove willful noncompliance with the FCRA, a plaintiff must show that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others, but need not show malice or evil motive." Cushman v. TransUnion Corporation, 115 F.3d 220, 226 (3d Cir. 1997) (citing Philbin v. TransUnion Corporation, 101 F.3d 957, 970 (3d Cir. 1996).

The plaintiff in Philbin argued that TransUnion committed a willful violation because he notified it of an inaccuracy several times, but TransUnion failed to correct it, resulting in him being denied credit on several occasions. Philbin, 101 F.3d at 970. The Third Circuit held that multiple request to correct erroneous information "falls short of evidence of a willful violation." Id.

Courts outside the Third Circuit have demonstrated that proof of willful noncompliance carries a heavy burden. Where an ongoing dialogue between a consumer and a credit reporting agency failed to produce the immediate correction of inaccurate information, courts have found that without "some indication that the reporting agencies knowingly and intentionally acted with conscious disregard of plaintiff's rights," there can be no funding of willful noncompliance. Thomas v. Gulf Coast Credit Services, Inc., 214 F. Supp.2d 1228, 1238 (M.D. Ala. 2002).

Campbell v. Chase Manhattan Bank, 2005 U.S. Dist. LEXIS 16402 (D.N.J. June 27, 2005), is instructive. In that matter, plaintiffs sued Chase Manhattan Bank, which had issued plaintiff several credit cards, for violations of the FCBA and FCRA. Plaintiff alleged that Chase failed to inform the credit reporting agencies of several disputed inaccuracies on their credit reports, which included serious delinquencies. Id. at 28. Specifically, plaintiff alleged that Chase violated Section 1681s-2(b) of the FCRA, which

places a duty on furnishers of information to (A) conduct an investigation regarding information it provided to a credit reporting agency once receiving notice that such information is disputed; (B) review all relevant information provided by the credit reporting agency; (C) report the results of the investigation to the credit reporting agency; and (D) if the investigation finds that the information is incomplete, report that information to all other credit reporting agencies to which it initially furnished the information. *Id.* at 46-47. See also Lewis v. Ohio Professional Electronic Network LLC, 248 F. Supp. 693 (S.D. Ohio 2003) (holding that the Fair Credit Reporting Act did not only apply to credit reporting agencies).

Chase first incorrectly sent plaintiffs a past-due notice because it misplaced a check plaintiffs sent toward the credit card balance. After this initial misunderstanding, plaintiffs were denied a mortgage based upon a report from TransUnion. When plaintiffs advised Chase of this, Chase sent a "Bullseye Report" to all three credit bureaus, instructing them to update their systems to note that plaintiff was not delinquent.

Nevertheless, Experian continued to possess a negative credit report because Chase had allegedly, again, verified a delinquent credit history. Again, Chase sent another Bullseye Report to all bureaus. This pattern kept repeating several times, and ultimately plaintiffs finally filed suit.

Plaintiffs ultimately moved for summary judgment against Chase under the FCRA because it allegedly failed to respond to the credit bureaus' requests for information. However, the Court found that plaintiffs had no evidence to support plaintiffs' contention of willfulness, and denied their motion.

Here too, there is no basis for concluding that American Express' complained of

˘23˘

conduct was willful. As a result, plaintiff's request for punitive damages with respect to plaintiff's fourth cause of action should be denied.

## PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES UNDER ANY OF HIS ASSERTED CAUSES OF ACTION

Each of plaintiff's causes of action seeks the imposition of punitive damages. Under New Jersey law, punitive damages can only be imposed where there has been (1) either actual malice or a wanton and willful disregard of persons who foreseeably might be harmed and (2) involved acts of deception or at least reckless disregard of the consequences and (3) must continue over an extended period of time with full awareness of the harm.

Here, there is no proof that American Express's conduct and/or its failure to act satisfied any one of these requirements, let alone all three. There is no proof that the complained of conduct was due to either actual malice or a wanton and willful disregard of plaintiff, or involved acts of deception or at least reckless disregard of the consequences, or continued over an extended period of time with full awareness of the harm.

Plaintiff's own deposition testimony on this issue is telling. Plaintiff admitted that the only reason he felt he was entitled to punitive damages was because his "credit was tarnished", because he "had to go to Court", because he "wrote letters", because of "harassing phone calls", because of "damage to his credit" and because his credit card was cancelled:

**Q.** And why do you believe punitive is appropriate here?
**A.** Because we're going on with this.

**Q.** What is this?

**A.** The trouble.

**Q.** Not the trouble, not the lawsuit.

**A.** Yeah. Well, I had to go to Court in August of 2006, okay. In order to - - in order to - - you were suing me. In order to win.

**Q.** In '06 you went to court?

**A.** Yes.

**Q.** For our - - for American Express' suit against you?

**A.** Tri-State, against Tri-State.

**Q.** In '06?

**A.** Yes.

**Q.** And so you believe - - so this has been going on since '06?

**A.** This case with my credit began in 2004.

**Q.** This lawsuit. This lawsuit where you sued American Express.

**A.** That's when you put it on my credit card, credit report, 2004.

**Q.** I'm just trying to understand. You're confusing me.

**A.** In 2004 it began.

**Q.** What is this? When you say this, what is this?

**A.** When American Express came after me to pay the Tri-State account.

**Q.** Okay. That started in 2004, not 2006?

**A.** No, 2004

**Q.** Okay.

**A.** I went to court to clear my name, okay. I prevailed. No one gave a damn to clear my credit.

**Q.** Okay.

**A.** No one.

**Q.** So is that why you believe that you're entitled to punitive because you went to court?

**A.** No, there's additional.

**Q.** That's what I'm trying to understand.

**A.** That my credit was tarnished.

ˇ25ˇ

**Q.** So you believe your's entitled to punitive damages because your credit was tarnished?
**A.** Yes.

**Q.** Anything else?
**A.** Yes. I had to go to court. I tried to write letters to get people to do the right thing.

**Q.** You are entitled to punitive damages because you went to court?
**A.** That I prevailed and no one cared and I was harassed. I'm giving you all the reasons.

**Q.** I'm trying to get clarity here.
**Q.** Please stop for a minute. Give me a yes or no and I can move on and then I can - - do you believe you're entitled to punitive damages because you went to court?
**A.** Yes.

**Q.** Do you believe you're entitled to punitive damages because you wrote letters?
**A.** Yes. And no one followed sit to try to - - I got sick over it.

**Q.** Do you believe you're entitled to punitive damages because you wrote letters? Yes or no, Mr. Cosmas.
**A.** Yes.

**Q.** Do you believe you're entitled to punitive damages because you prevailed in the lawsuit between you and American Express?
**A.** Yes.

**Q.** Do you believe you're entitled to punitive damages for any other reasons other than what we've spoken about?
**A.** Yes.

**Q.** Tell me please.
**A.** The arrogance of American Express not to - - clear my credit. There was - - there was supposed to be a mediator, a court appointed mediator and he wrote -- which it was our notes and he wrote down that you weren't looking to comply. Here, let me show you.

**Q.** Please by all means.
**A.** Yeah, in there. There was going to be a Mr. Berger we were supposed to -- court appointed mediator to clear this whole mess up.

˅26˅

**Q.**   You don't mean this lawsuit, you mean the other lawsuit?

**A.**   Exactly.

**Q.**   Between you and -- you were the defendant?

**A.**   Well, that is what created -- by erroneously putting that on my account on my credit report here. The mediator court appointed found that American Express, Amex, has not indicated their intent to appear on 3/15 and have not provided any authority to settle on their behalf. The mediator believes they are not acting in good faith with regard to mediation.

**Q.**   Excuse me, I ask you questions, you answer them. That's how this works. Let me ask you again. Do you believe you're entitled to punitive damages because of some negotiations there from the mediator in this case?

**A.**   No, I'm just showing --

**Q.**   That's what I've been trying to get at.

**A.**   No, no, the telephone calls.

**Q.**   I'm trying to understand why you believe you're entitled to punitive damages that's all.

**A.**   Harassing phone calls, damaging my credit.

**Q.**   Harassing phone calls. What else? We spoke about a number of things because you went to court because you prevailed because you wrote letters; right?

**A.**   Yeah.

**Q.**   Because you got harassing phone calls. What other reasons are there that you believe you're entitled to punitive damages?

**A.**   And the damaging of my credit.

**Q.**   And the damaging of your credit. Anything else.

**A.**   Isn't that enough?

**Q.**   I'm simply asking the question, Mr. Cosmas.   I'm not engaging in a debate with you. I'm asking questions.

**A.**   You have some of the bases.

**Q.**   Is that all of them at present?

**A.**   I don't know. I can't think straight. I've been here for five hours.

**Q.**   I'm sorry, I can't accept where I have some of them. I want

˅27˅

to know all of the reasons why you believe you're entitled to punitive damages.

**A.**     My credit card canceled by American Express that I had from 1971 for 33 years.

**Q.**     What other reason?

**A.**     My personal.

**Q.**     What other reasons?

**A.**     Thirty-three years. The insult that I had my aunt on the card as a supplementary which she spent like $25 a month, may be $40 so the card to be canceled and I had to go to her, my card is canceled that I don't have. It's an embarrassing situation.

**Q.**     What are other reasons?

**A.**     My -- when I wanted to get -- well, you know about the monies, okay. We spoke about the other credit cards. That's all I can think of right now.

(Pages 199 - 205 of deposition transcript of plaintiff, annexed to the Affirmation

of Jack Gross as **Exhibit "G"**).

In light of the foregoing, plaintiff has not established his entitlement to punitive

damages under any of his claimed causes of action and plaintiff's request for that relief

should be denied as to all of plaintiff's causes of action.

## STANDARD FOR SUMMARY JUDGMENT

Under the standards announced by the Supreme Court's trilogy in Celotex Corp.

v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed 2d 202 (1986) and Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538

(1986), "the mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment." Anderson, 477

U.S. at 247-48.

Where a moving party has made a properly supported motion for summary judgment, it is incumbent upon the nonmoving party to come forward with specific facts to show that there is a genuine issue of material fact for trial. Anderson, 477 U.S. at 248. Thus, once a moving party has carried its burden of establishing the absence of a genuine issue of material fact, the nonmoving party "may not rest upon mere allegations or denials", Fed. R. Civ. P. 56(e), but must produce sufficient evidence that will reasonably support a jury verdict in its favor. J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813, F.2d 610, 618 (3d Cir. 1987). The nonmoving party may not merely raise 'some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586.

Since a motion for summary judgment is designed to go beyond the pleadings, factual specificity is required of a party who opposes such a motion. Celotex, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed2d 265 (1986). Accordingly, in order to defeat a properly supported motion for summary judgment, a party may not merely restate the allegations of the Complaint. Farmer v. Carlson, 685 F. Supp. 1335 (M.D. Pa. 1988). Moreover, a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record. Colotex, 477 U.S. at 322-23. A non-moving party must point to concrete evidence in the record which supports each essential element of his case. Id. If the party fails to provide such evidence, then he is not entitled to a trial and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(e).

## **CONCLUSION**

For all the reasons set forth above, plaintiff's first cause of action for specific performance should be dismissed because it is moot; plaintiff's second cause of action for negligence should be dismissed for lack of proximate cause; plaintiff's third cause of action for intentional tort should be dismissed because plaintiff has other causes of action available and because there is no proof that American Express' conduct was malicious or retaliatory; plaintiff's fourth cause of action for violation of the FCRA should be dismissed for lack of specificity, because American Express is not a credit reporting agency, because the FCRA excludes reports sent about transactions or experiences between a consumer and the person making the report and because plaintiff's FCRA claim is time barred.

Dated: New York, New York
November 25, 2009

Yours, etc.

**GOLDBERG & ASSOCIATES**

By:

Jack Gross (6845)
*Attorneys for American Express Bank F.S.B., i/s/h/a American Express Centurion Bank*
75 Main Street, Suite 201
Millburn, New Jersey 07041

TO:   Timothy J. Provost, Esq.
      Provost & Colrick, PA
      *Attorneys for Plaintiff*
      50 Thoreau Drive
      Freehold, New Jersey 07728

˅30˅